**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| | : | **Criminal Action No. 15-177 (ES)** |
| **v.** | : | |
| | : | **OPINION** |
| **ADOLPHUS NWOKEDI,** | : | |
| | : | |
| **Defendant.** | : | |

SALAS, DISTRICT JUDGE

A jury found Defendant Adolphus Nwokedi ("Nwokedi" or "Defendant") guilty of knowingly and intentionally conspiring and agreeing with others to import into the United States from India a mixture and substance containing a detectable amount of heroin in violation of 21 U.S.C. § 963.  (*See* D.E. Nos. 15 & 31).  Nwokedi has moved for a judgment of acquittal and a new trial under Federal Rules of Criminal Procedure 29 and 33, respectively.  (*See* D.E. No. 46). For the reasons below, his applications are DENIED.

## I.    FACTUAL & PROCEDURAL BACKGROUND[1]

On April 16, 2015, a federal grand jury returned a one-count indictment against Nwokedi. (D.E. No. 15).  The single count charged that—between approximately October 2013 and approximately 2014—Nwokedi "did knowingly and intentionally conspire and agree with others to import into the United States from a place outside thereof, namely India, 100 grams or more of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance," contrary to 21 U.S.C. §§ 952(a) and 960(b)(2)(A) and in violation of 21 U.S.C. §

---

[1]     Where relevant, the Court also discusses additional evidence elsewhere in this Opinion.

963.  (*Id.*).[2]  On December 8, 2015, the Court empaneled a jury and began trial of this matter. (D.E. No. 27).  At trial, the following evidence was adduced.

On October 24, 2013, Nwokedi sent an international text message to an individual named "Mary Jane" that identified his home address in Sayreville, New Jersey.  (Government Exhibit ("GX") 309 at 1; GX 601 at 1; 12/9/15 Tr. at 52:16-53:16[3]).  On November 1, 2013, Mary Jane sent a text message to Nwokedi containing a tracking number for a parcel shipped from India. (GX 106; GX 309 at 1; GX 601 at 1; 12/9/15 Tr. at 8:24-9:22, 147:19-148:14).  This parcel was shipped from Mumbai, India to Nwokedi's home, and, on November 12, 2013, Nwokedi signed for it.  (GX 106; 12/9/15 Tr. at 8:24-10:15, 147:19-148:14).

On December 1, 2013, Nwokedi sent a text message to Mary Jane with his business address—i.e., "Ebube motors" located at 180 Poinier Street in Newark, New Jersey.  (GX 309 at 2; GX 601 at 4; 12/9/15 Tr. at 149:1-15).  On December 6, 2013, a second parcel (the "parcel-at-issue") was shipped from Mumbai, India.  (GX 105; 12/9/15 Tr. at 10:16-11:17).  This parcel was intended for Nwokedi's Poinier Street business address in Newark, and the phone number for the intended recipient was associated with Nwokedi.  (GX 102; GX 105; GX 105A; GX 105B; 12/9/15 Tr. at 37:5-13, 52:16-53:4, 57:23-59:9).  The parcel-at-issue had printed on it, among other things, the intended recipient as "Ebube motors."  (*See* GX 102).

But, on December 11, 2013, a Customs and Border Protection ("CBP") officer at John F. Kennedy Airport intercepted the parcel-at-issue.  (GX 101; GX 105; 12/8/15 Tr. at 32:4-33:20).

---

[2]      21 U.S.C. § 952(a) provides, in relevant part, that "[i]t shall be unlawful to import into the customs territory of the United States from any place outside thereof (but within the United States), or to import into the United States from any place outside thereof, any controlled substance in schedule I . . . ."

21 U.S.C. § 960(a) provides, in relevant part, that "(a) Any person who-- (1) contrary to section . . . 952 . . . of this title, knowingly or intentionally imports or exports a controlled substance . . . shall be punished as provided in subsection (b) of this section."  21 U.S.C. § 960(b)(2)(A) concerns a violation involving "100 grams or more of a mixture or substance containing a detectable amount of heroin."

[3]      The Court refers to trial transcripts as "12/__/15 Tr." available at Docket Entry Nos. 40-43.

The CBP officer opened it and discovered bags containing powder that were ultimately determined to be—based on three separate preliminary chemical tests—narcotics, opiates, and heroin.  (12/8/15 Tr. at 33:21-37:6).  Further testing by a CBP chemist determined that the powder was heroin and the net weight was approximately 502 grams.  (GX 109; 12/9/15 Tr. at 23:18-25:10, 29:14-31:20).  The chemist, however, did not determine the percentage of heroin in the packages—i.e., the actual purity of the heroin.  (*See* 12/9/15 Tr. at 34:11-35:2).  Homeland Security Investigations ("HSI") agents photographed the parcel-at-issue and its contents, including the bags of heroin.  (*See* GX 102).  The seized heroin was inadvertently destroyed before trial.  (12/9/15 Tr. at 176:24-177:9).

On December 12, 2013, Nwokedi sent a text message to an individual named Samuel Soremekun.  (GX 310 at 1; GX 601 at 4; 12/9/15 Tr. at 62:22-63:1).  Soremekun was Nwokedi's business associate at the Poinier Street location.  (12/9/15 Tr. at 55:1-57:9).  In the message, Nwokedi asked Soremekun to receive the parcel-at-issue on behalf of Ebube Motors.  (GX 310 at 1; GX 601 at 4; 12/9/15 Tr. at 62:13-63:1).  On December 16, 2013, Mary Jane sent a text message to Nwokedi inquiring why Nwokedi was not answering his phone.  (*See* GX 601 at 6).

HSI agents then conducted two controlled deliveries of the parcel-at-issue.  (12/9/15 Tr. at 112:14-117:22).  Importantly, during the second controlled delivery on December 17, 2013, HSI agents delivered the parcel-at-issue to Soremekun who recognized Ebube Motors as a company belonging to Nwokedi.  (*Id.* at 54:2-14, 58:10-60:4, 116:1-117:13).  Soremekun signed for the parcel-at-issue, explaining that he routinely signed for parcels intended for Nwokedi because Ebube Motors was Soremekun's client.  (*Id.* at 56:11-60:4).  And Soremekun testified that Nwokedi specifically had asked him to sign for the parcel-at-issue a few days before the December 17 controlled delivery.  (*Id.* at 59:24-63:1; *see also* GX 310 at 1).  After Soremekun

signed for the parcel-at-issue, law enforcement approached and interviewed Soremekun "to determine his involvement" with the parcel.  (*See* 12/9/15 Tr. at 116:1-118:23).

While Soremekun was speaking to HSI agents, Nwokedi called Soremekun and left him a voicemail.  (*See* GX 201; 12/9/15 Tr. at 65:19-66:6, 70:6-72:4).  On the voicemail, Nwokedi told Soremekun that he was out of the country and asked that Soremekun receive the parcel-at-issue on Nwokedi's behalf because he did not want it to get returned while he was out of the country. (*Id.*).

Soremekun then texted Nwokedi that he had received the parcel-at-issue.  (GX 310 at 2; 12/9/15 Tr. at 72:5-73:3).  Nwokedi forwarded Soremekun's text message confirming receipt of the parcel-at-issue to Mary Jane.  (GX 601 at 6).  Mary Jane then texted Nwokedi the following: "good luck."  (*Id.*).

Soremekun agreed to help law enforcement coordinate a meeting with Nwokedi. (12/9/15 Tr. at 73:7-9).  Thereafter, Nwokedi sent Soremekun text messages that concerned, among other things, the parcel-at-issue.  (GX 601 at 6-11).  During this same timeframe, Nwokedi received calls and text messages from Mary Jane and an individual named "Chuks." (*Id.*).  As Nwokedi himself would later testify, Chuks was supposed to be the ultimate recipient of the parcel-at-issue.  (12/9/15 Tr. at 143:18-145:12).

On January 2, 2014, Soremekun and Nwokedi met in the parking lot of the Poinier Street address in Newark.  (*Id.* at 127:9-129:19).  Nwokedi took the parcel-at-issue from Soremekun. (*Id.* at 129:20-23).  Nwokedi was then arrested and taken into custody.  (*Id.* at 129:24-25).

An HSI special agent testified that, during his subsequent post-arrest interview, Nwokedi stated he was a businessman and shipped cars for profit, primarily to Africa.  (*Id.* at 138:2-8). The special agent testified that he first stated that the parcel-at-issue had car mirrors that he

purchased from eBay, Inc. for a Mercedes Benz he was going to ship to a friend named "Tony" in Nigeria.  (*Id.* at 138:12-141:8; *see also* 12/10/15 Tr. at 15:3-15 (Nwokedi testifying that Tony was a customer and a friend of his)).[4]  In particular, special agent testified that Nwokedi said the parcel-at-issue had been sent from India and he bought the mirrors on eBay.  (12/9/15 Tr. at 140:19-25).  The special agent further testified that Nwokedi's "story kind of started changing a little bit" and that Nwokedi told the agents that his friend, Mary Jane, had sent him the parcel-at-issue.  (*Id.* at 141:13-142:3).

But, after HSI agents told Nwokedi that the parcel-at-issue had heroin, the special agent testified Nwokedi told the agents he had agreed to receive this parcel from Mary Jane and was going to be paid $3,000 to deliver it to "Chuks" in New York.  (*Id.* at 143:18-145:12, 151:16-21).  The special agent also testified that Nwokedi "kind of slumped over a little bit, looked to me like his eyes may have welled up a bit," that "[h]e didn't say much for a short time," and "then he admitted that he knew that in [sic] were drugs in that box."  (*Id.* at 143:18-25).  The special agent also testified that Nwokedi told the agents that Mary Jane used a code word, "market," to refer to the contents of the parcel-at-issue.  (*Id.* at 144:13-144:20).  The special agent testified that Nwokedi understood this word to mean narcotics.  (*Id.*).

Nwokedi then agreed to help HSI agents to effect a controlled delivery to Chuks.  (*See id.* at 153:2-158:25).  But Chuks never followed up with Nwokedi about a meeting location, which was part of the reason the controlled delivery never took place.  (*See id.* at 159:11-19).

After the Government's case-in-chief, Nwokedi moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29.  (12/10/15 Tr. at 5:8-11).  The bases for his motion— made in open court—were as follows: (1) "we did do not [sic] have the actual drugs that were

---

[4]     Nwokedi was advised of and waived his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966).  (*See* GX 107; 12/9/15 Tr. at 132:3-135:7).  He also gave consent to search his cell phone.  (*See* GX 108; 12/9/15 Tr. at 135:8-137:1).

allegedly seized in this case" and, since "the drugs have been destroyed prior to trial," they were "not here for the jury to see and make that determination" (*id.* at 5:14-20); and (2) a "lack of evidence" because the Government's case was based on "circumstantial evidence of phone calls and text messages" that "are equally explainable with an innocent explanation" and "an alleged confession" that a "rational trier of fact could [not] credit[] under the circumstances and what we have learned about that from the trial" (*id.* at 5:21-6:7).

The Government opposed the motion.  (*Id.* at 6:10-7:15).  The Court reserved ruling on Nwokedi's motion pursuant to Federal Rule of Criminal Procedure 29(b) (*id.* at 7:16-8:1) and ordered the parties to submit briefing on the motion (*id.* at 8:2:8:18).  Nwokedi renewed his Rule 29 motion after the defense's case-in-chief, which the Court again reserved resolution of.  (*Id.* at 81:3-12).

After the jury found Nwokedi guilty of the offense and while awaiting sentencing, the Court received correspondence from Nwokedi stating, among other things, that he was dissatisfied with his trial counsel and he sought new counsel.  The Court appointed new counsel for Nwokedi and permitted his new counsel an opportunity to familiarize himself with this matter and make any motion accordingly.  (*See* D.E. No. 44).  To be sure, "Nwokedi relies on the record for his Rule 29 motion and[,] in addition, makes this Rule 33 motion."  (D.E. No. 46 ("Def. Mov. Br." at 2)).

## II.   STANDARD OF REVIEW

### a.   Federal Rule of Criminal Procedure 29

Under Rule 29(a), the district court "on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  But a district court "must 'sustain the verdict if there is substantial evidence, viewed in the light most

favorable to the government, to uphold the jury's decision.'" *United States v. Flores*, 454 F.3d 149, 154 (3d Cir. 2006) (quoting *United States v. Gambone*, 314 F.3d 163, 169-70 (3d Cir. 2003)).

In particular, "a court 'must be ever vigilant in the context of Fed. R. Crim. P. 29 not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury.'" *Id.* (quoting *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005)).  Rather, a court must view "the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence." *United States v. Silveus*, 542 F.3d 993, 1002 (3d Cir. 2008) (quoting *United States v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002)); *see also United States v. Styles*, No. 15-2629, 2016 WL 4254914, at *3 (3d Cir. Aug. 12, 2016) (citation omitted) ("We review the evidence presented at trial in the light most favorable to the government to determine whether any rational trier of fact could find each essential element of the crime beyond a reasonable doubt."); *Gambone*, 314 F.3d at 170 ("In making our review we examine the totality of the evidence, both direct and circumstantial. We must credit all available inferences in favor of the government." (internal citation omitted)).

**b.  Federal Rule of Criminal Procedure 33**

Under Rule 33(a), "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  But, "even if a district court believes that the jury verdict is contrary to the weight of the evidence, it can order a new trial 'only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted.'" *Silveus*, 542 F.3d at 1004-05 (quoting *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002)).  Rule 33 "motions are to be granted sparingly and

- 7 -

only in exceptional cases." *United States v. Brennan*, 326 F.3d 176, 189 (3d Cir. 2003) (citation omitted).

Notably, "when a district court evaluates a Rule 33 motion it does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case." *Johnson*, 302 F.3d at 150.

## III.   DISCUSSION

### a.   The Government's purported bad faith

As noted above, Nwokedi moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29 at the close of the Government's case-in-chief on the grounds noted above.   (*See* 12/10/15 Tr. at 5:8-6:7).   Similar to those contentions, in his post-trial motion, Nwokedi argues that the Government acted in bad faith for the following two reasons: (1) the only evidence regarding his involvement was his admission, but this was never recorded or memorialized; and (2) he had no opportunity to test or weigh the drugs—which were inadvertently destroyed by the Government.   (*See* Def. Mov. Br. at 6-11).   In other words, Nwokedi faults the Government because "the only evidence against Nwokedi -- his statement and the drugs -- were not preserved and presented to the jurors for their consideration."   (*Id.* at 10; *see also* 12/10/15 Tr. at 5:9-6:7).

Further, Nwokedi argues that,

> [a]t the very least, the jury finding that the drugs entailed 100 grams or more of heroin should be vacated for insufficiency of evidence since the jurors could not assess either the drugs or the purity in considering the testimony by the Government chemist in accordance with this Court's instruction on expert testimony, and also because Nwokedi never admitted to knowledge about the weight of drugs.

(Def. Mov. Br. at 10-11 (internal citation omitted)).  Nwokedi seeks a new trial in the interests of justice.  (*Id.* at 11).

In opposition, the Government contends that "the entirety of the conspiracy was laid out in defendant's confession" to an HSI special agent—HSI Special Agent Andrew Danchuk—who was present during Nwokedi's post-arrest interview.  (D.E. No. 57 ("Gov't Opp. Br.") at 7-8, 14).  And the Government avers that this was "presented to the jury in the form of Special Agent Danchuk's own testimony."  (*Id.* at 14).  It argues that such testimony "was an entirely acceptable manner in which to prove the content of the defendant's post-arrest statement" and that there is "no requirement that a defendant's post-arrest statement be audio or video recorded."  (*Id.*).  The Government asserts that "the jury was free to credit this testimony, which very nearly established in and of itself all of the essential elements of the charged offense."  (*Id.* at 15).

In any event, the Government argues that it "presented a host of other evidence from which any rational jury could have concluded that defendant knew there was a controlled substance" in the parcel-at-issue, including: (1) Nwokedi's text messages claiming ownership of the parcel-at-issue and his apparent concern over this parcel; (2) Nwokedi's lie to Soremekun concerning this parcel's contents after Soremekun had taken custody of the parcel-at-issue on Nwokedi's behalf; (3) Nwokedi's communications with both Mary Jane and Chuks regarding the status of the parcel-at-issue; and (4) testimony about the $3,000 Nwokedi expected to receive for delivery of the parcel-at-issue.  (*Id.* at 15-16).

And, as to the nature and weight of the substance found in the parcel-at-issue, the Government contends that it presented "extensive evidence," including testimony about the CBP officer's initial seizure and the three field tests confirming that it was heroin, as well as

testimony and reports from a forensic chemist who determined the substance was heroin.  (*Id.* at 16-17).  To be sure, the Government argues that the purity of the heroin is not relevant to the jury's determination because Nwokedi was charged with importing "100 grams or more of a *mixture and substance* containing a detectable amount of heroin."  (*Id.* at 17 (emphasis in original)).

Finally, the Government asserts that—to the extent Nwokedi alleges bad faith based on the inadvertent destruction of drugs or the HSI Agent's purported total fabrication of Nwokedi's confession—this would be the subject of a motion under Federal Rule of Criminal Procedure 12(b)(3)(A) concerning outrageous government conduct that Nwokedi could have made, but didn't.  (*Id.* at 19-20).

Like here, in *United States v. Cummings*, "[t]he illegal objective of the conspiracy . . . was to import a controlled substance in violation of 21 U.S.C. §§ 952(a) & 963."  156 F. App'x 438, 440 (3d Cir. 2005).  In *Cummings*, the Third Circuit explained that:

> Section 952(a) makes it unlawful to import "any controlled substance in schedule I or II of subchapter I of this chapter"; section 963 makes "[a]ny person who attempts or conspires to commit any offense defined in this subchapter" subject to "the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." Neither section makes knowledge of the specific identity of the controlled substance an element of the crime.

*Id.*

"To establish a charge of conspiracy, the Government must show (1) a shared unity of purpose, (2) an intent to achieve a common illegal goal, and (3) an agreement to work toward that goal, which [the defendant] knowingly joined."  *United States v. Boria*, 592 F.3d 476, 481 (3d Cir. 2010) (citation omitted).  So, "[c]onviction for conspiracy requires proof that the

defendant has 'knowledge of the illegal objective contemplated by the conspiracy.'" *Cummings*, 156 F. App'x at 440 (quoting *United States v. Mastrangelo*, 172 F.3d 288, 291 (3d Cir. 1999)).

Here, as the Government aptly notes, Nwokedi points to no authority—nor is the Court aware of any—requiring that the Government's post-arrest statement be recorded by video or audio. Although at the close of the Government's case Nwokedi argued that the Government's case was based on "circumstantial evidence of phone calls and text messages" that "are equally explainable with an innocent explanation" (12/10/15 Tr. at 5:21-6:7), the Court finds that a rational trier of fact could conclude that Nwokedi joined an agreement to import a controlled substance into the United States from India knowing the purpose of the agreement was to effectuate such importation. *See Silveus*, 542 F.3d at 1002 ("[W]e apply a particularly deferential standard of review, . . . viewing the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence." (internal quotation marks and citations omitted)); *Gambone*, 314 F.3d at 170 ("In making our review we examine the totality of the evidence, both direct and circumstantial. We must credit all available inferences in favor of the government." (internal citation omitted)).

After all, to find otherwise would be tantamount to setting aside the jury's consideration of Nwokedi's post-arrest confession that HSI Special Agent Danchuk recounted in his testimony and accepting Nwokedi's assertion that this agent lied, (*see* 12/9/15 Tr. at 143:18-145:12, 151:16-21; 12/10/15 Tr. at 75:3-8, 75:20-25), as well as setting aside the circumstantial evidence involving Nwokedi's numerous communications about the parcel-at-issue and efforts to coordinate delivery of this parcel. This Court cannot usurp the role of the jury. *See Flores*, 454 F.3d at 154 ("As we have made clear, a court must be ever vigilant in the context of Fed. R.

Crim. P. 29 not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." (internal quotation marks and citations omitted)); *see also United States v. David*, 222 F. App'x 210, 214 (3d Cir. 2007) (explaining that "issues of witness credibility . . . are strictly within the province of the jury" and the jury "has authority to credit all, none, or any part of the evidence properly before it").

For similar reasons, the Court cannot accept Nwokedi's contention regarding the nature and weight of the controlled substance found in the parcel-at-issue. As the Government again aptly notes, the jury was provided results of three field tests, forensic testimony and a report, and pictures of the substance taken from the parcel-at-issue. (*See* GX 102; GX 109; 12/8/15 Tr. at 33:21-37:6; 12/9/15 Tr. at 24:17-25:10, 29:14-31:20).

To be sure, it appears undisputed that the drugs from the parcel-at-issue were unavailable for Nwokedi to test and to be presented at trial for the jurors' consideration. But what also appears undisputed is that Nwokedi knew—well before trial—that the drugs had been inadvertently destroyed and he had HSI reports concerning his post-arrest statements. And Nwokedi had an opportunity to cross-examine the witnesses who testified about opening the parcel-at-issue, discovering the bags of powder, conducting the three separate preliminary chemical tests, and determining that the powder was heroin with a net weight of approximately 502 grams. (*See* GX 109; 12/8/15 Tr. at 33:21-37:6; 12/9/15 Tr. at 24:17-25:10, 29:14-31:20, 33:1-36:15).[5] Again, the Court finds that a rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence after examining the totality of the evidence, including circumstantial evidence, especially in light of the Court's obligation to credit all available inferences in favor of the Government on a Rule 29 motion.

---

[5] The Court notes that Nwokedi made no pretrial motion concerning the inadvertent destruction of the heroin in this case or the HSI reports concerning his post-arrest statements.

Next, for purposes of Rule 33, the Court is unconvinced that a new trial is warranted on the grounds of "a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted"—for largely the same reasons as the Court's resolution of Nwokedi's Rule 29 contention.  *See Silveus*, 542 F.3d at 1004-05 (internal quotation marks and citation omitted); *see also Styles*, 2016 WL 4254914, at *3 (addressing Rule 29 motion and finding that defendant's convictions "were supported by sufficient evidence" and, for the same reasons, "the district court correctly denied relief under Rule 33").

In addition to the HSI agent's testimony concerning Nwokedi's role in receiving the parcel-at-issue from Mary Jane and getting paid to deliver it to Chuks, as well as Nwokedi's understanding that the parcel-at-issue contained narcotics, (12/9/15 Tr. at 143:18-145:12, 151:16-21), cross-examination of Nwokedi revealed telling inconsistencies.  In particular, Nwokedi testified that he didn't know Chuks and that the logged communications with Chuks resulted from Tony using Nwokedi's phone.  (*See* 12/10/15 Tr. at 17:17-18:9).  But he then admitted on cross-examination that—during the critical period at the end of November 2013 through early January 2014—Tony was *not* using Nwokedi's phone.  (*See id.* at 41:9-42:7, 67:6-13, 68:11-18).  And it was during this time period that Nwokedi exchanged calls and text messages with Chuks.  (*See* GX 601 at 6-12)[6]; *cf. David*, 222 F. App'x at 216 ("The District Court, like the jury, had the opportunity to observe the witnesses and evidence first hand.").

Finally, the Court addresses Nwokedi's argument that,

> [a]t the very least, the jury finding that the drugs entailed 100 grams or more of heroin should be vacated for insufficiency of evidence since the jurors could not assess either the drugs or the purity in considering the testimony by the Government chemist in accordance with this Court's instruction on expert testimony, and

---

[6]     For example, there were two incoming calls from Chuks to Nwokedi on December 27, 2013 (one which lasted two minutes and one which lasted three minutes).  (*See* GX 601 at 6-7).

> also because Nwokedi never admitted to knowledge about the weight of drugs.

(Def. Mov. Br. at 10-11 (internal citation omitted)).  As the Government convincingly responds, the indictment charged Nwokedi, in relevant part, of importing "100 grams or more of a *mixture and substance* containing a detectable amount of heroin."  (*See* D.E. No. 15 (emphasis added)). Therefore, it is unclear why the inability to test purity of the heroin warrants a new trial.[7]  And, regarding Nwokedi's claim that he "never admitted to knowledge about the weight of drugs," Nwokedi provides no law—nor is the Court aware of any—that such knowledge is required for purposes of 21 U.S.C. § 960.  *See, e.g.*, *United States v. Jefferson*, 791 F.3d 1013, 1015 (9th Cir. 2015) ("The government is not required to prove that the defendant knew the type or quantity of the controlled substance he imported to obtain a conviction under § 960(a), . . . or for the penalties under § 960(b) to apply . . . ." (internal citations omitted)).

Thus, exercising its own judgment in assessing the Government's case, the Court cannot find that this is an exceptional case that warrants granting a Rule 33 motion.  *See Brennan*, 326 F.3d at 189; *Johnson*, 302 F.3d at 150.

### b.  The purported lack of evidence supporting the willful-blindness instruction

Nwokedi argues that the Court's willful-blindness instruction "was inappropriate and incorrect, and denied Nwokedi due process of law under the United States Constitution."  (Def.

---

[7]      *Cf. Chapman v. United States*, 500 U.S. 453, 460 (1991) ("[I]f the carrier is a 'mixture or substance containing a detectable amount of the drug,' then under the language of [21 U.S.C. § 841] the weight of the mixture or substance, and not the weight of the pure drug, is controlling."); *United States v. Gori*, 324 F.3d 234, 238 (3d Cir. 2003) (analyzing 21 U.S.C. § 841 and concluding that, "whether a drug plus its carrier is a mixture turns not on the purity of the controlled substance contained therein, but rather on how 'combined' the substances are"); *United States v. Berroa-Medrano*, 303 F.3d 277, 281-82 (3d Cir. 2002) ("The Supreme Court has observed that since the terms 'mixture' and 'substance' have not been defined in the statute or the Sentencing Guidelines and have no distinctive common-law meaning, they should be construed . . . to have their ordinary meaning. . . . [T]he entire contents of the larger of the two packages used to sentence Berroa appears to satisfy the criteria identified by the *Chapman* court for identifying a 'mixture' or a 'substance.'" (internal quotation marks,  alterations, and citation omitted)).

Mov. Br. at 11-13 (citing 12/10/15 Tr. at 120:9-122:1)).  He asserts "there was no evidence of deliberate acts of avoidance to support the willful blindness charge."  (*Id.* at 15).  More specifically, Nwokedi argues that the "record lacks any evidence that Nwokedi took deliberate actions to avoid finding out that the package from India contained drugs." (*Id.* at 16).  Because "there was no basis to give a willful blindness instruction," Nwokedi argues that the Court, "in the interests of justice[,] should vacate Nwokedi's conspiracy conviction and grant him a new trial." (*Id.* at 18-19).

In opposition, the Government argues that, under Third Circuit precedent, it "need not present direct evidence of conscious avoidance to justify a willful blindness instruction." (Gov't Mov. Br. at 21-22 (quoting *United States v. Stadtmauer*, 620 F.3d 238, 259 (3d Cir. 2010))). And the Government contends that, here, the "record is replete with instances of defendant's conduct from which the jury could have inferred willful blindness." (*See id.* at 22 (providing examples)).  The Government argues that such evidence was enough "for a jury to find that defendant was aware of a high probability" that the parcel-at-issue "contained a controlled substance, but that he deliberately avoided learning the truth." (*Id.*).  The Government notes that Nwokedi's own motion posits that he was an "unwitting dupe." (*Id.* at 23 (quoting Def. Mov. Br. at 10)).

The Third Circuit has *rejected* the "contention that so long as there is sufficient evidence of actual knowledge, a willful blindness charge is at all events inappropriate." *See United States v. Wert-Ruiz*, 228 F.3d 250, 252 (3d Cir. 2000).  Rather, "assuming there to be sufficient evidence as to both theories, it is not inconsistent for a court to give a charge on both willful blindness and actual knowledge." *Id.* (citing *United States v. Stewart*, 185 F.3d 112, 126 (3d Cir. 1999)).  "This is so because, if the jury does not find the existence of actual knowledge, it might

still find that the facts support a finding of willful blindness." *Id.* Moreover, "[t]he Government need not present *direct* evidence of conscious avoidance to justify a willful blindness instruction." *Stadtmauer*, 620 F.3d at 259 (emphasis in original).[8]

Given these precepts, the Court must reject Nwokedi's arguments. As an initial matter, the Court is not persuaded to the extent Nwokedi suggests that, because the Government introduced evidence of actual knowledge, a willful-blindness charge was inappropriate. *See Wert-Ruiz*, 228 F.3d at 252.

The Court must also reject his contention that there was no basis for a willful-blindness instruction because there was no evidence of any deliberate acts to avoid finding out that the parcel-at-issue had drugs. *See Stadtmauer*, 620 F.3d at 259; *Wert-Ruiz*, 228 F.3d at 252. Nwokedi's reliance on the Supreme Court's *Global-Tech Appliances, Inc. v. SEB S.A.* decision (*see* Def. Mov. Br. at 15) does not compel a different result. In that decision, the Supreme Court cited decisions from various Courts of Appeal and determined that "all appear to agree on two basic requirements: (1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." 563 U.S. 754, 769 (2011) (citing, among other cases, *Stadtmauer*, 620 F.3d at 257).

The problem for Nwokedi is that the record has evidence supporting an *inference* of deliberate actions of conscious avoidance. *See United States v. Whittington*, 26 F.3d 456, 463 (4th Cir. 1994) ("A deliberate avoidance instruction, like all jury instructions, is proper only if there is a foundation in evidence to support a finding of deliberate avoidance. The record need not contain direct evidence, however, that the defendant deliberately avoided knowledge of wrongdoing; all that is necessary is evidence from which the jury could infer deliberate

---

[8]        *See also United States v. Bissell*, 954 F. Supp. 903, 915 (D.N.J. 1997) ("A deliberate ignorance instruction is appropriately given when a defendant asserts a lack of guilty knowledge and there are facts and evidence that support an inference of deliberate ignorance." (citations omitted)).

avoidance of knowledge." (internal quotation marks, alterations and citations omitted)); *see also Stadtmauer*, 620 F.3d at 259 ("The Government need not present *direct* evidence of conscious avoidance to justify a willful blindness instruction."); *Bissell*, 954 F. Supp. at 915 ("A deliberate ignorance instruction is appropriately given when a defendant asserts a lack of guilty knowledge and there are facts and evidence that support an inference of deliberate ignorance.").

In particular, HSI Special Agent Andrew Danchuk testified that—during his post-arrest interview—Nwokedi knew the parcel-at-issue was "valuable" and he "started telling [the agents] that he was scheduled to make some money from it"—i.e., "[t]hat once he delivered that package to Chuks in New York, that he would be paid $3,000." (12/9/15 Tr. at 144:21-145:12, 174:4-12). Nwokedi admitted on cross-examination that he told Soremekun "there were car parts in the box even though [he] knew that there weren't." (12/10/15 Tr. at 71:11-13). He also admitted that he told law enforcement that there were car mirrors in the box even though he "knew there were no car mirrors in the box." (*Id.* at 73:1-7, 73:22-74:1; *see also id.* at 33:13-34:1).

Thus, the record had Agent Danchuk's testimony that Nwokedi would be paid $3,000 to deliver a package from New Jersey to New York and evidence of Nwokedi's repeated misrepresentations that it contained car mirrors. The Court finds that the record as a whole—and, in particular, this evidence—supports an inference of deliberate action of conscious avoidance and therefore the Court's willful-blindness instruction (that was agreed-upon by the parties) was appropriate.[9]

---

[9]     The Court notes that the parties jointly submitted jury instructions—pursuant to the Court's directive—and held a charge conference in which Nwokedi failed to raise any objection to the willful-blindness instruction. (*See* 12/10/15 Tr. at 83:4-96:15).

### c. Even assuming a basis to give an instruction on willful blindness, the instruction was purportedly fatally flawed

Nwokedi argues the willful-blindness instruction was fatally flawed because "it equated constructive knowledge of the [parcel-at-issue's] contents with guilt of the conspiracy." (Def. Mov. Br. at 19). He asserts that the Court's instruction provides "simply an incorrect definition of conspiracy since it omits both the elements of knowing participation, and intent to further the aims of the conspiracy." (*Id.* at 20). Nwokedi posits that "a juror may very well have thought that willful blindness of the contents of the parcel dispensed with the otherwise requisite elements of participation and intent to further the aims of the conspiracy." (*Id.*). So he contends that, "in the interests of justice," the Court should reverse his conviction and order a new trial. (*Id.* at 21).

The Court's willful-blindness instruction to the jury was, in relevant part, as follows:

> 24, willful blindness. *To find a defendant guilty of the offense you must find that the government proved beyond a reasonable doubt that the defendant knew that the objective of the conspiracy was to import a controlled substance into the United States.* In this case, there is a question whether the defendant knew that the mail parcel contained a controlled substance. When, as in this case, knowledge of a particular fact or circumstance is an essential part of the offense charged, the government may alternatively prove that the defendant knew of that fact or circumstance if the evidence proves beyond a reasonable doubt that the defendant deliberately closed his eyes to what would otherwise have been obvious to him.

> No one can avoid responsibility for a crime by deliberately ignoring what is obvious. Thus, you may find that the defendant knew that the objective of the conspiracy was to import a controlled substance based on evidence which proves that, one, the defendant was aware of a high probability that the parcel contained a controlled substance, and two, the defendant consciously and deliberately tried to avoid learning that the parcel contained a controlled substance.

(12/10/15 Tr. at 120:9-121:8 (italics added)).   Nwokedi asserts—without citing any legal authority—that the italicized portion of the instruction "is simply an incorrect definition of conspiracy since it omits both the elements of knowing participation, and intent to further the aims of the conspiracy."  (Def. Mov. Br. at 19-20).

The Government responds that, "in instructing the jury on willful blindness, [the Court] tracked the Third Circuit's Model Jury Instruction"—which rightfully involved instructions concerning burden of proof, the reasonable doubt standard, and the elements of the offense (including the knowledge element).  (Gov't Opp. Br. at 23-24).

*First*, as the Government rightly responds, the willful-blindness instruction used by the Court tracks the Third Circuit's model instructions for willful blindness and Nwokedi did not object to this instruction at the charge conference.  (*See* 12/10/15 Tr. at 89:10-16); *see also United States v. Petersen*, 622 F.3d 196, 208 (3d Cir. 2010) ("We have a hard time concluding that the use of our own model jury instruction can constitute error . . . .").

*Second*, it is not apparent how the elements of knowing participation and intent to further the aims of conspiracy are removed in light of the parties' agreed-upon willful-blindness instruction.  This is particularly so given the Court's instructions on, among other things: "Elements of the offense, controlled substances, conspiracy" (instruction number 21) (*see* 12/10/15 Tr. at 116:19-118:14); "Conspiracy. Membership in the agreement" (instruction number 26) (*see id.* at 123:22-125:10); and "Conspiracy, mental states" (instruction number 27) (*see id.* at 125:11-126:8).

In particular, the Court instructed the jury that, to find Nwokedi guilty, it must find "that the government proved beyond a reasonable doubt . . . that Adolphus Nwokedi joined the agreement or conspiracy knowing of its objective to import a controlled substance into the

United States and intending to join together with at least one other alleged conspirator to achieve that objective." (*Id.* at 117:24-118:11). Further, the Court instructed that the "government must prove that the defendant knew the goal or objective of the agreement or conspiracy, and voluntarily joined it during its existence, intending to achieve the common goal or objective, and to work together with the other alleged conspirators toward the goal or objective." (*Id.* at 124:5-10). Thus, the Court finds that the jury instructions—in their totality—do not omit any essential elements of a conspiracy. And Nwokedi fails to cite any authority to suggest otherwise. (*See* Def. Mov. Br. at 20).

### d. Nwokedi's remaining challenges to the Court's willful-blindness instruction

Nwokedi argues that, even if there was a basis for the willful-blindness instruction and it did not "short-circuit" the conspiracy elements, it still "uprooted the reasonable doubt standard, undermined the knowledge element and improperly shifted the burden onto Nwokedi to show that he actually did not know the parcel contained illegal drugs." (Def. Mov. Br. at 21). He argues that "[k]nowledge about the contents of the parcel does not equate to participation in the conspiracy, much less show an intent to further the aims of the conspiracy." (*Id.* at 24). He asserts the "willful blindness instruction, without explicit clarification, at the very least caused a domino effect that ultimately diluted the Government's burden to prove that Nwokedi had the intent to further the conspiracy based upon deliberate avoidance regarding the contents of one parcel." (*Id.* at 25). Nwokedi also criticizes the use of the phrase "high probability" in the instruction, arguing that this phrase "serves as an alternative and improper definition pertaining to the reasonable doubt standard as well as the requisite mental state of knowledge." (*Id.* at 26). He therefore contends that the Court should vacate the conviction and order a new trial in the interests of justice. (*Id.*).

In opposition, the Government argues that the Third Circuit has "held that a willful blindness instruction, when properly given, does not shift the burden of proof to the defendant." (Gov't Opp. Br. at 24 (citing *United States v. Tai*, 750 F.3d 309 (3d Cir. 2014)).

The Court finds Nwokedi's attack on the Court's willful-blindness instruction unconvincing. As an initial matter, the Court has already rejected his contention that the Court's instructions somehow omitted the elements of participation in the conspiracy and an intent to further the aims of the conspiracy. (*See* Def. Mov. Br. at 24). Likewise, the Court has already rejected Nwokedi's attack on the willful-blindness instruction on the grounds that the instruction used by the Court tracks the Third Circuit's model instructions for willful blindness—which Nwokedi did not object to at the charge conference. (*See* 12/10/15 Tr. at 89:10-16). The Court is simply disinclined to question the propriety of the Third Circuit's model instruction and, in particular, the use of the phrase "high probability" and Nwokedi's complaint about the "lack of any definition regarding it." (*See* Def. Mov. Br. at 25-26); *see Petersen*, 622 F.3d at 208.[10]

Further, the Court is not convinced that the Government's burden was "diluted" or "improperly shifted onto Nwokedi." After all, the Court instructed the jury that Nwokedi was presumed innocent, that Nwokedi has no obligation to prove that he is not guilty, that the Government must prove each and every element of the charged offense beyond a reasonable doubt, that the Government must prove beyond a reasonable doubt that Nwokedi joined the agreement knowing of its objective to import a controlled substance into the United States, that the Government must prove beyond a reasonable doubt that Nwokedi knew that what he conspired to import was a controlled substance—all *before* the Court instructed the jury on willful blindness. (*See* 12/10/15 Tr. at 99:8-120:9).

---

[10] *See also Global-Tech Appliances*, 563 U.S. at 769 ("[A] willfully blind defendant is one who takes deliberate actions to avoid confirming a *high probability* of wrongdoing and who can almost be said to have actually known the critical facts." (emphasis added)).

- 21 -

And the Court's willful-blindness instruction itself explained that:

> When, as in this case, knowledge of a particular fact or circumstance is an essential part of the offense charged, the government may . . . prove that the defendant knew of that fact or circumstance if the evidence proves beyond a reasonable doubt that the defendant deliberately closed his eyes to what would otherwise have been obvious to him.

(*Id.* at 120:16-23).  After this instruction, among other things, the Court instructed the jury that:

> If you find that a criminal agreement or conspiracy existed, then in order to find . . . the defendant guilty of conspiracy, *you must also find that the government proved beyond a reasonable doubt* that the defendant knowingly and intentionally joined that agreement or conspiracy during its existence. The government must prove that the defendant knew the goal or objective of the agreement or conspiracy, and voluntarily joined it during its existence, intending to achieve the common goal or objective, and to work together with the other alleged conspirators toward the goal or objective.
>
> . . . .
>
> In order to find the defendant guilty of a conspiracy *you must find that the government proved beyond a reasonable doubt* that the defendant joined the conspiracy knowing of its objective, and intending to help further or achieve that objective. That is, the *government must prove*, one, that the defendant knew of the objective or goal of the conspiracy, two, that the defendant joined the conspiracy, intending to help further or achieve that goal or objective.

(*Id.* at 123:24-124:10, 125:11-16 (emphases added)).

Under such circumstances, the Court cannot find improper burden-shifting.[11]   Indeed, "[w]hen the [Court's] instructions are read as a whole, it is clear that no jury could conclude that

---

[11]      *See Tai*, 750 F.3d at 315 ("[T]he willful blindness jury instruction as a whole came after the jury was told the Government bears the burden to prove that Tai acted knowingly and with an intent to defraud. The willful blindness instruction then explicitly explained that 'the Government may prove' this element through evidence that established beyond a reasonable doubt that Tai 'deliberately closed his eyes to what would otherwise have been obvious to him.' . . . [T]he District Court told the jury that it could not find knowledge based on a willful blindness theory unless the Government proved Tai's knowledge beyond a reasonable doubt, and in fact the jury was expressly told at the beginning of the instructions that Tai never had to prove anything, and that the burden always remained on the government.").

[Nwokedi] bore the burden of proof as to any aspect of his knowledge." *See Tai*, 750 F.3d at 315-16.

Finally, the Court is not persuaded that the willful-blindness instruction provided by the Court "sets forth a unique and ethereal alternative to actual knowledge." (*See* Def. Mov. Br. at 26). Nwokedi argues that he has a right to defend and should have a chance "to show that he did not deliberately avoid incriminating circumstances—whether it pertains simply to the contents of the parcel, or the circumstances surrounding the conspiracy." (*Id.* at 26-27). In sum and substance, Nwokedi argues that the Court's willful-blindness instruction "constructively and improperly amended the indictment" and that, without any "explicit charge in the indictment regarding willful blindness," he "was deprived of proper notice about a unique alternative mental state that he had a right to defend against." (*Id.*).

But Nwokedi fails to set forth *how* he was somehow hampered in cross-examining or presenting testimony "to show that he did not deliberately avoid incriminating circumstances." (*See id.* at 26). Rather, this again appears to be an attack on the propriety of giving a willful-blindness instruction itself—which the Court mirrored off of the Third Circuit model instructions. To be sure, Nwokedi cites no authority supporting that an indictment itself must have an explicit charge of willful blindness. (*See id.* at 26-27).

## IV.    Conclusion

For the reasons discussed above, Defendant's motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 is denied, as is his motion for a new trial pursuant to Federal Rule of Criminal Procedure 33. An appropriate Order accompanies this Opinion.

*s/Esther Salas*
**Esther Salas, U.S.D.J.**
